**Beverly SHOEMAKER–STEPHEN,**
**Plaintiff,**

v.

**MONTGOMERY COUNTY BOARD**
**OF COMMISSIONERS, et al.,**
**Defendants.**

**No. C–3–01–179.**

United States District Court,
S.D. Ohio,
Western Division.

Jan. 6, 2003.

James R. Greene, III, James R. Greene III & Associates, Dayton, OH, for Plaintiff.

John Frederick Krumholtz, Montgomery County Prosecutor's Office, Dayton, OH, for Defendants.

DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. # 12); JUDGMENT TO ENTER IN FAVOR OF THE DEFENDANTS AND AGAINST THE PLAINTIFF; TERMINATION ENTRY

RICE, Chief Judge.

Plaintiff herein is Beverly Shoemaker Stephan, a former employee of Montgomery County, Ohio ("County"), with which she held the position of Custodial Worker I. Defendants are the County Board of Commissioners ("Board"), William Underberger, Jeff Trick, and Leon Walker (collectively, "Defendants"). Plaintiff was terminated from her job on June 28, 2000. In this action, she has stated five claims for relief in her Verified Complaint (Doc. # 1), arising under both federal and state law. Those claims are for sexual harassment, hostile work environment, retaliation, negligent or reckless training and hiring, and intentional infliction of emotional distress. Defendants now move for summary judgment, contending that there are no genuine issues of material fact upon which reasonable minds could disagree. (*See* Doc. # 12.)

For the reasons stated below, the Court will sustain Defendants' Motion for Summary Judgment.

I. *Background Facts* [1]

Plaintiff worked for the County at the Reibold Building, in the position of Custodial Worker I, over two distinct periods of time, the first extending from November, 1987, through November, 1992, and the second extending from February 6, 1995, through June 28, 2000. (Compl.¶ 6.) Underberger was her supervisor from November of 1998, Trick was the Building and Maintenance Superintendent for the County Public Works Department, and Walker was the County Personnel Director. (*Id.* ¶¶ 8, 9, 10 & 14.) On December 14, 1998, Underberger told Plaintiff to replace the cords and brushes on a vacuum cleaner, a job typically carried out by maintenance staff, not the custodial staff. (*Id.* ¶ 16.) For about an hour, Underber-

---

**1.** For purposes of ruling on the Defendants' Motion for Summary Judgment, the Court will construe the facts, and all reasonable inferences drawn therefrom, in the light most favorable to the Plaintiff, who is the non-moving party. Because Plaintiff has filed a verified complaint, it is worth noting that the allegations stated therein have the same effect as affidavit statements for the purpose of opposing summary judgment. *See Lavado v. Keohane,* 992 F.2d 601, 605 (6th Cir.1993).

ger hovered around Plaintiff, and even "brushed" her backside, while she carried out the task in the building's stock room, located in the basement, next to his office. (*Id.*)

On December 15, 1998, Underberger told Plaintiff to clean a restroom, and in January of 1999, he instructed her to pick up a used condom off an escalator, even though on both occasions others were also available to do the jobs. (*Id.* ¶¶ 17, 18.) On January 29, 1999, Underberger told Plaintiff to replace a paper towel dispenser in the men's restroom, even though this job, as with the vacuum cleaner job, was typically performed by the maintenance staff. (*Id.* ¶ 19.) While Plaintiff carried out this task, Underberger again hovered around her and "brushed" her backside. (*Id.*) On February 3, 1999, Underberger yelled at and berated Plaintiff when he found her off of her assigned floor. (*Id.* ¶ 20.) On April 9, 1999, Underberger yelled at Plaintiff and another worker, Vanessa Ward, while they were stocking their carts. (*Id.* ¶ 21.) Plaintiff reported this incident to Mitch Johnson, a Building Maintenance Supervisor, and three days later, Plaintiff, Ward, Underberger, and Johnson met to discuss the incident. (*Id.* ¶¶ 22, 23.) At that meeting, Underberger told Plaintiff that her performance had better improve, and opined that she should be written up for insubordination. (*Id.* ¶ 23.) Plaintiff then told Underberger that she might file a harassment charge against him. (*Id.* ¶ 25.)

On May 25, 1999, Underberger issued a memorandum to Plaintiff in which he stated that if her attitude toward her job and her supervisors did not improve, she would subject herself to progressive disciplinary measures. (*Id.* ¶ 26 & Ex. B.) Plaintiff responded on June 4, 1999, with a memorandum of her own, in which she challenged the basis for Underberger's questioning of her attitude and respect for authority, and pointed out that she had never received a poor review in her previous nine years of employment with the County. (*Id.* ¶ 27 & Ex. C.) Shortly thereafter, Plaintiff informed Trick of Underberger's conduct toward her, which she opined was hostile in nature. (*Id.* ¶ 28.)

On one occasion, Underberger called Plaintiff at her home and asked her for her shirt size. (*Id.*) On June 21, 1999, Plaintiff filed a complaint of sex discrimination with the County against Underberger, citing specifically, as the basis for her complaint, the events of December 14, 1998, and January 29, 1999, and more generally the whole of her previous six months of employment. (*Id.* ¶ 29 & Ex. E.) Shortly thereafter, Johnson assumed direct supervision of Plaintiff, replacing Underberger in this regard. (Underberger Aff., attached to Doc. # 12, ¶ 11.) On December 16, 1999, Underberger stated to Plaintiff, "what the hell are you looking at?" (Compl. ¶ 30.) Later that same day, Underberger tried to accost Plaintiff physically. (*Id.* ¶ 31.) Plaintiff left work early that morning because she felt threatened, and also because she had a doctor's appointment later in the day. (*Id.*) After leaving work, she left voice messages for both Johnson and Trick, explaining the reason for her early departure. (*Id.* ¶ 32.) At a subsequent point in time, Plaintiff applied for sick leave, but the request was denied by Trick, who told her to return to work. (*Id.* ¶ 33.) He also denied her request for leave pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"). (*Id.* ¶ 34.) She did not apply for disability leave, but was absent from work from December 16, 1999, through June 16, 2000, during which time she underwent five surgeries. (*Id.* ¶¶ 34, 35.) While she was away from work, Trick called her at home on several occasions requesting that she return. (*Id.* ¶ 36.) Trick did not allow Plaintiff to file a com-

plaint related to Underberger's conduct on December 16, 1999. (*Id.* ¶ 37.)

On January 12, 2000, Walker notified Plaintiff that her complaint of June 21, 1999, was not well taken because her claims of sex discrimination against Underberger could not be substantiated. (*Id.* ¶ 38 & Ex. G.) On January 24, 2000, Plaintiff filed a sex discrimination and retaliation charge with the Equal Employment Opportunity Commission ("EEOC"), citing Underberger's conduct dating back to June 8, 1999, and the fact that she had filed a discrimination complaint with the County, as the basis for her claim. (*Id.* ¶ 40 & Ex. H.)[2] On June 16, 2000, Plaintiff returned to work where she was informed by Trick that she had failed to submit proper medical documentation justifying her leave, which otherwise had been unauthorized. (*Id.* ¶ 41.) On June 28, 2000, Walker terminated Plaintiff for unauthorized leave of absence, willful insubordination, and failure of good behavior. (*Id.* ¶ 43 & Ex. I.) On July 3, 2000, Plaintiff contested her discharge pursuant to the County's labor-management contract with the Dayton Public Service Union ("Union"). (*Id.* ¶ 51 & Ex. O.) Said contest was denied by the County over the request of the Union to impose less severe punishment. (*Id.* ¶ 53 & Ex. P.) Plaintiff filed a second EEOC complaint, signed on October 24, 2000, this time citing her termination and the surrounding explanation for such proffered by the County as evidence of sexual discrimination, and as evidence of retaliation for her having filed her previous EEOC complaint. (*Id.* ¶ 11 & Ex. A.)[3]

On June 5, 2001, a neutral arbitrator denied Plaintiff's appeal of her discharge. (Walker Aff., attached to Doc. # 12, ¶ 6.)

Plaintiff contends that she submitted all of the medical documentation necessary to demonstrate that her extended leave from work was necessary. Defendants assert that she did not, and that she was uncooperative when it was requested that she undergo a medical evaluation with a County-appointed physician for purposes of verifying her medical claims. Plaintiff also denies this latter charge.

In her First Claim for Relief, plead as to each Defendant, Plaintiff alleges that she was harassed and/or discriminated against on the basis of her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and Ohio Rev.Code § 4112.01, *et seq.* In her Second Claim for Relief, plead as to each Defendant, Plaintiff alleges that the Defendants violated those same provisions of federal and state law by creating a hostile work environment. Her Third Claim for Relief, plead as to each Defendant, states a claim for retaliation under Title VII, and alleges that she was terminated in June of 1998, on account of her having filed her EEOC claim the preceding January. Her Fourth Claim for Relief, plead as to the Board alone, states a claim for negligence and or recklessness with respect to the Board's hiring and training of Underberger, Trick, and Walker, and its investigation of Plaintiff's discrimination complaint against Underberger. Finally, in her Fifth Claim for Relief, plead as to all Defendants, Plaintiff states a claim for intentional infliction of emotional distress.

---

**2.** The dates specified as those on which the discrimination took place were June 1, 1999, through December 7, 1999. Plaintiff did not mark the box indicating that the discrimination was a "continuing action." (Compl. at Ex. H.)

**3.** The dates specified as those on which the discrimination took place were December 16, 1999, through June 28, 2000. Plaintiff did not mark the box indicating that the discrimination was a "continuing action." (Compl. at Ex. A.)

In moving for summary judgment, Defendants contend that Plaintiff's Complaint is untimely and/or that she has failed to adduce evidence giving rise to a genuine issue of material fact.

## II. *Standards Governing Motions for Summary Judgment*

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991)(The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.")(quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir. 1994)("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). Of course, in determining whether a genuine issue of ma-

terial fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the factfinder. 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Sys., Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

III. *Analysis*

Title VII prohibits an employer from discriminating against an employee, with respect to the terms, conditions, and privileges of one's employment, on the basis of sex. *See* 42 U.S.C. § 2000e 2(a)(1); *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 63, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Ohio Rev.Code § 4112.02(A) prohibits the same conduct as a matter of State law, and is generally construed in identical fashion to Title VII. *See Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n,* 66 Ohio St.2d 192, 421 N.E.2d 128 (1981); *Blankenship v. BMI Refractories,* 966 F.Supp. 555, 557 (S.D.Ohio 1997). A claim for retaliation in particular will lie under Title VII where the plaintiff can show that her employer took an adverse action against her on account of her having previously engaged in an activity protected by Title VII. *See* 42 U.S.C. § 2000e 3(a); *Mulhall v. Ashcroft,* 287 F.3d 543, 551 (6th Cir.2002); *see also* Ohio Rev.Code § 4112.02(I). Furthermore, "sexual harassment" is actionable where it has "*the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.*" 29 C.F.R. § 1604.11(a) (emphasis added); *see also Meritor,* 477 U.S. at 65–66, 106 S.Ct. 2399. The Supreme Court, in *Meritor,* recognized that actionable sexual harassment, by definition, arises upon proof that a hostile work environment existed on account of serious and ongoing acts of harassment motivated by sex based animus. 477 U.S. at 65–66, 106 S.Ct. 2399.

One area where Title VII and Ohio Rev.Code § 4112.01, *et seq.,* diverge is on the question of individual liability. The definition of employer in § 4112.01(A)(2) includes "any person acting directly or indirectly in the interest of an employer," and the Ohio Supreme Court has held that individual supervisors and managers can be held jointly liable with their employer, *as employers themselves,* for their own acts of discrimination. *See Genaro v. Central Transport, Inc.,* 84 Ohio St.3d 293, 703 N.E.2d 782, 785 (1997).

The federal standard is different, and under Title VII, individuals cannot be held liable. *See Wathen v. General Elec. Co.,* 115 F.3d 400, 405 (6th Cir.1997).

■■■ In order for the County to be held liable for the sexual harassment of an employee *by a supervisor,* Plaintiff must show that she 1) was a member of a protected class, 2) was subject to unwelcomed sexual harassment from a supervisor, 3) the harassment was based on her sex, and 4) the harassment created a hostile work environment. *See Williams v. General Motors Corp.,* 187 F.3d 553, 560 (6th Cir. 1999); *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. *When no tangible employment action is taken,* a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see* Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.... No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275 (emphasis added). In other words, where no tangible employment action has resulted, an employer is vicariously liable for the sexually harassing actions of its supervisors, but can exculpate itself by demonstrating, as an affirmative defense, that it took reasonable care to prevent and correct the offending supervisor's sexually harassing behavior, and that the aggrieved employee unreasonably failed to avail herself of the remedial actions of her employer.[4]

■■■ Before an aggrieved employee in Ohio can file a complaint with the EEOC, she must initiate proceedings with the Ohio Civil Rights Commission ("OCRC"). 42 U.S.C. § 2000e 5(c); *Rasimas v. Michigan Dept. of Mental Health,* 714 F.2d 614, 621 (6th Cir.1983); Ohio Rev.Code §§ 4112.03 & 4112.05. Thereafter, any complaint filed subsequently with the EEOC must be so filed within 300 days of the date of the alleged unlawful act. 42 U.S.C. § 2000e 5(e)(1). "A dis-

**4.** The standard is different under § 4112, in light of *Genaro.* Thereunder, the supervisor's unlawful act inculpates him and his employer jointly. With regard to the federal standard, Plaintiff cites an overly onerous, no longer applicable standard. Citing *Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 183–84 (6th Cir.), *cert. denied,* 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992), she states that it is one of her burdens to show that the County could have foreseen Underberger's alleged harassing behavior and that it failed to respond adequately and effectively. (Doc. # 13 at 11.) Plaintiff should take note that following the Supreme Court's 1998 decisions in *Faragher* and *Ellerth,* the *Kauffman* standard has been modified, and that it is not her burden, in cases of harassment that do not otherwise involve a tangible, adverse employment action, to prove that the actions *of a supervisor* (as distinguishable from those of a co-worker) were foreseeable or within the scope of employment, or that the County failed to respond adequately and effectively. It is enough to show that the alleged harassing acts were performed by a supervisor. At that point, the burden shifts to the employer to present the affirmative defense discussed in *Faragher, supra.*

crete retaliatory or discriminatory act 'occurred' on the day that it 'happened.' A party, therefore, must file a charge of discrimination within ... 300 days of the date of the act or lose the ability to recover for it." *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 2070–71, 153 L.Ed.2d 106 (2002). Thus, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts allegedly in timely filed charges." *Id.* at 2072. Of course, the limitations period is not jurisdictional in nature, and may be waived if not raised defensively. *See id.*

▆▆▆▆ A different evaluation must be given to claims of hostile work environment based on sexual harassment. *See id.* at 2073. "In determining whether an actionable hostile work environment exists, [the Court] is to look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Id.* at 2074 (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)); *see also Burnett v. Tyco Corp.,* 203 F.3d 980, 982 (6th Cir.), *cert. denied,* 531 U.S. 928, 121 S.Ct. 307, 148 L.Ed.2d 246 (2000). "Discrimination in this form occurs 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Williams,* 187 F.3d at 560 (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367); *see also Faragher,* 524 U.S. at 788, 118 S.Ct. 2275

("We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment."). Because a hostile work environment claim "is comprised of a series of separate acts that collectively constitute on 'unlawful employment practice,' ... it does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period." *Morgan,* 122 S.Ct. at 2074. It is enough if at least one of the component acts falls within the limitations period. *See id.*

Herein, although most references will be made to "Title VII," the parties should understand that because Ohio's discrimination laws, except with respect to individual liability, are construed in analogous fashion with Title VII, the Court's statements and rulings with respect to Title VII, and Plaintiff's claims thereunder, are of equal effect with respect to Ohio Rev.Code § 4112.01, *et seq.*[5]

### A. *Timeliness of Claims & Discrete Acts of Discrimination*

Defendants contend that Plaintiff's first EEOC complaint necessarily turned on the allegations that Underberger "brushed" her back on December 14, 1998, and again on January 29, 1999. Because these alleged incidents took place, if at all, more than 300 days prior to January 24, 2000, the date on which she filed her first "OCRC" complaint, they contend that Plaintiff's Complaint, with respect to her First Claim for Relief (sexual harassment and discrimination) and Second Claim for Relief (hostile work environment), is barred by Title VII's statute of limitations.[6]

---

5. In any event, because the Court finds no evidence of discriminatory conduct, the different standard on the individual liability issue is of no moment herein.

6. With respect to the disposition of EEOC complaints in general, upon receipt of a Notice of Right to Sue from the EEOC, the aggrieved is provided a period of 90 days during which he may file suit in federal or state court. 42 U.S.C. § 2000e 5(f)(1). There

To the extent Defendants intend to argue that Plaintiff is barred from relying on the brushing incidents as evidence of discrete acts of discrimination, their argument is academic. This is because individual acts of sexual harassment, which are not, on their own, so extreme as to create a change in the terms and conditions of employment, do not violate the prohibitions of Title VII. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) ("Isolated incidents, ... unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment."). Because the brushing incidents, taken by themselves, did not change the conditions of Plaintiff's employment, they do not constitute adverse employment actions, and they are simply not enough to sustain a claim for sexual discrimination, even if they were complained of in a timely manner.[7]

On the other hand, as *Morgan* makes plain, acts of harassment are not barred from consideration for purposes of a harassment claim (i.e., hostile work environment), even if they were complained of in an untimely manner, as long as other acts within the same pattern of harassment are complained of in a timely manner. Thus, to the extent Defendants in-

tend to argue that Plaintiff cannot rely on the brushing incidents to establish her claims of harassment, the Court must assess whether it could be found that those alleged incidents were part of a larger pattern of continuing harassment, and that Plaintiff complained of other harassing acts, within that larger pattern of harassment, in a timely manner.[8]

Before the Court turns to that assessment, however, it will consider whether any other actions allegedly taken by Defendants might possibly be construed as adverse employment actions (i.e., discrete acts of discrimination). If there is no basis for finding as much, then Plaintiff's First and Second Claims for Relief lack separate identities, and are repetitious, given that, in the Title VII context, "harassment" and "hostile work environment" mean the same thing. In other words, if there are not any facts on which a claim for sexual discrimination can be sustained separately from Plaintiff's claim for hostile work environment, the First and Second Claims will be treated by the Court as one and the same.

The only discrete action taken against Plaintiff which appears to be individually actionable as an adverse employment action, is her actual termination, which occurred on June 28, 2000.[9] However, Plain-

is no doubt Plaintiff's Complaint is timely in this regard. On the other hand, the Court is not aware of what became of her first EEOC complaint. Nor has Plaintiff informed the Court of the an actual date on which she filed her second EEOC complaint, or whether she initiated proceedings with the OCRC in the first instance. *See Rasimas*, 714 F.2d at 621. Given that Defendants do not raise these particular matters of procedure, the Court will not dwell on them.

7. There is no allegation that Underberger coerced Plaintiff to allow him to brush her by threatening to take action against her if she did not. Such "quid pro quo" harassment would be enough to trigger discrimination liability without regard to other incidents of harassment. *See* 29 C.F.R. § 1604.11(a); *Meritor*, 477 U.S. at 65, 106 S.Ct. 2399.

8. Plaintiff did not actually base her first EEOC complaint on the two "brushing" acts to which Defendants refer (*see* Compl. at Ex. H), and Plaintiff's action in this Court was triggered not by the first EEOC complaint, but by the second, signed on October 24, 2000. (Compl. ¶ 11 & Ex. A.) In this regard, Defendants' argument is errantly premised. Nevertheless, to the extent the statute of limitations argument is relevant, the Court will not dismiss it merely because it is phrased in a cumbersome fashion, particularly given the fact that Plaintiff did not respond to the argument.

9. In her Memorandum Contra, Plaintiff states that the "first" tangible adverse employment action occurred when she was transferred from the Reibold Building to the Common

tiff only invokes her termination in her Verified Complaint for purposes of making out a claim for retaliation, as plead in her Third Claim for Relief (Compl.¶ 75), and there is no other indication, even in her Memorandum Contra, that Plaintiff's First Claim for Relief stems from her termination (as a discrete act of discrimination). Indeed, as crafted in her Memorandum Contra, the entirety of her argument on this issue is devoted to a hostile work environment theory of liability. (Doc. # 13 at 10–15.) Understandably, within the context of Plaintiff's First Claim for Relief, Defendants did not submit an argument on the question of whether Plaintiff's termination was motivated by sexual animus. In light of Plaintiff's total silence on this matter, the Court is reluctant to stretch the ambit of her discrimination claim in a fashion Defendants could not have anticipated.[10] Because there is no evidence that Defendants engaged in any discrete acts of discrimination against Plaintiff, such that Plaintiff's employment

was adversely affected by such acts, the Court will treat Plaintiff's First Claim for Relief, for harassment, and her Second Claim for Relief, for hostile work environment, as one and the same.

### B. Hostile Work Environment

With regard to her Second Claim for Relief, Plaintiff contends that her hostile work environment claim encompasses not only the alleged brushing incidents, but all of the alleged non-sexual acts of harassment. (Doc. # 13 at 10.) The allegations other than of the two alleged brushing actions include: 1) the fact that the tasks Plaintiff was asked to perform on the two occasions she was allegedly brushed were typically maintenance jobs and not custodial jobs; 2) Underberger's request that she clean a bathroom; 3) the request that she clean up and dispose of a used condom; 4) Underberger's yelling at her on February 3, 1999; 5) his yelling at her on April 9, 1999; 6) his "threat" on April 12, 1999, that she better improve or

---

Pleas Courts Building. (Doc. # 13 at 14.) Yet, Defendants have adduced facts, to which Plaintiff does not respond, that she was transferred in early January, 2000, while on her extended leave, to the Courts Building, where she would work under a female supervisor, in response to her own complaint that she could not work with Underberger at the Reibold Building. (Trick Aff. ¶ 10; Johnson Aff. ¶ 7.) Given the fact that this employment action appears responsive to her wishes, the Court cannot, without further explanation from Plaintiff, find it adverse.

10. Even had Plaintiff alleged that her termination was an adverse employment action, she would be unable to make out a prima facie case of discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To demonstrate a prima facie case of discrimination under Title VII in the employment termination context, the plaintiff must demonstrate "(1) membership in the protected class; (2) that she suffered an adverse action; (3) that she was qualified for the position; and (4)

that she was replaced by someone outside the protected class or was treated differently from similarly situated members of the unprotected class." Hoskins v. Oakland County Sheriff's Dept., 227 F.3d 719, 731 (6th Cir.2000). In this case, Plaintiff's First Claim for Relief would not survive because there is no evidence that she was replaced by someone outside the protected class or treated differently from similarly situated males. As demonstrated by certain attachments to Plaintiff's Memorandum Contra, Defendants purportedly stated in an Admission that two open Custodial Worker I positions were filled after Plaintiff's departure, one by a male, another by a female. In a purported response to an Interrogatory, Defendants stated that Plaintiff's position in particular was filled initially by an outside custodial service, and ultimately by the male, almost four months after her termination. Even if these facts were in some way relevant, Plaintiff's silence on this matter, along with the fact that the documents are not authenticated, leads the Court to give them no weight.

she would be written up for insubordination; 7) his issuance of the negative performance memorandum on May 25, 1999; 8) his calling her at home for her shirt size; 9) his asking her, "What the hell are you looking at?;" 10) his physical threat on December 16, 1999; 11) Trick's treatment of her while she was away on leave, including his request that she return to work, his refusal to grant her formal leave, and his refusal to accept a discrimination complaint arising out of her alleged December 16, 1999, altercation with Underberger; 12) Johnson's assurances that her medical statements would be enough to justify her absence over the first half of 2000; 13) the adequacy and duration of the County's investigation of her internal discrimination complaint of June 21, 1999, as finalized in Walker's written report of January 12, 2000; and 14) her being terminated on June 28, 2000.

With respect to the merits of the allegations that Underberger "brushed" her on two occasions, Defendants contend that these were, at most, inadvertent contacts which neither constitute sexual harassment, when taken individually, nor contribute to a hostile work environment. Underberger, who admits to having supervised Plaintiff in December of 1998 while she replaced the brush and cord of a vacuum cleaner, does not recall touching Plaintiff during their time together. (Underberger Aff., attached to Doc. # 12, ¶ 4.) He also does not remember touching her in January, 1999, on the occasion he instructed her to replace the paper towel dispenser in the men's bathroom, although he does admit that he asked her to perform this task, and that in assisting her in the completion of this task, they worked "very closely together." (*Id.* ¶ 6.) The balance of the allegations related to him, Defendants argue, demonstrate "at most[,] overzealous supervision of [Plaintiff] by [Underberger] when he was new to her work group." (Doc. # 12 at 9.)

The existence of a hostile work environment is to be determined by reference to the totality of the circumstances. *Williams,* 187 F.3d at 561. This creates an objective test for determining whether a reasonable person would find the working environment hostile. *Id.* at 566 (citing *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367). Importantly, the Sixth Circuit has stressed that in evaluating a claim of harassment based on sex, the term "sex" must be understood as "gender," such that gender-based animus is all that need be shown; evidence that the defendant engaged in sexually explicit conduct need not be. *Id.* at 565. The Court must also conduct a subjective inquiry, and determine whether the plaintiff herself felt threatened. *Id.* at 566 (citing *Harris, supra*).

Herein, Plaintiff states she felt her work environment was hostile (Compl.¶¶ 61–65), and there is no reason to discount this allegation at this stage of the litigation. The objective test thus remains the linchpin to her surviving summary judgment on this claim. In considering the totality of the circumstances, the Court begins with a consideration of the four factors set forth in the Supreme Court's holding in *Harris:* the frequency of discriminatory conduct; its severity; whether it was physically threatening or humiliating; and whether it unreasonably interfered with Plaintiff's work performance. 510 U.S. at 23, 114 S.Ct. 367; *Burnett,* 203 F.3d at 982. To be sure, this rubric is notably soft around the edges. *See, e.g., Harris,* 510 U.S. at 24, 114 S.Ct. 367 (Scalia, J., concurring) (opining that the totality of the circumstances test provides "little certitude" and leaves "unguided juries [to] decide whether sex-related conduct engaged in (or permitted by) an employer is egregious enough to warrant an award of damages"). Nevertheless, the cases make clear that before the Court can reach the objective test, it must first be satisfied that there is

a bare minimum level of gender-related conduct to consider; conduct that bears no signs of sex or gender-related animus does not become part of the calculus. With this in mind, the probative value of many of the allegations which bear no characteristics of sexually harassing conduct may be discounted in their entirety.

*First*, nothing that Plaintiff has stated or adduced indicates that the actions of Trick, Johnson, or Walker had anything to do with Plaintiff's gender. Plaintiff's complaint with Johnson is that he assured her that so long as she could properly document that her extended absence was born of medical necessity, she would not face disciplinary action. Defendants do not dispute that proper medical documentation would have kept Plaintiff in good stead and thus her purported reliance on Johnson's statements to her reveals nothing about any gender-based animus on his part. The issue on this point, if it is even relevant, is whether she complied with Johnson's request, but because Johnson himself cannot approve leave (*see* Johnson Aff. ¶ 6), it really does not concern Johnson at all.

Her complaint with Walker is that he took too long in completing his investigation of her complaint of June 21, 1999. The Court does not sit as a management oversight body, and without any benchmark by which to analyze whether Plaintiff's complaint was handled differently than those of male employees, it is impossible to infer that Walker's six-month investigation, which included interviews with fourteen co-workers, some of whom were interviewed on multiple occasions, was delayed or corrupted because she is a woman.

Finally, as to Trick, Plaintiff complains that he denied her the right to file a complaint against Underberger, denied her the right to FMLA or sick leave, requested that she return to work during her extended absence, and refused to acknowledge that she had filed proper medical documentation of her reasons for her absence. The Court simply does not know what Plaintiff means in stating that Trick failed to let her file an internal complaint against Underberger on account of their December 16, 1999, encounter. She does not so much as state when she attempted to file such. From the appearance of the copy of her complaint filed on June 21, 1999, it does not seem that an authorizing signature is required prior to filing. (Compl. at Ex. E.) In any event, even if what Plaintiff had intended to state was that Trick would not *accept* her complaint, without any elaboration of how the surrounding events unfolded, it is impossible to infer that his action was related to her gender, particularly given the fact that she had already filed one discrimination complaint without apparent hassle.

With regard for her request for FMLA leave, Defendants have adduced facts, to which Plaintiff does not respond, showing that she did not qualify for such (Johnson Aff. ¶ 4; Trick Aff. ¶ 6), and based on this information, the Court finds nothing improper about the County's action in refusing such leave. As for the allegations concerning Trick's refusal to grant Plaintiff sick leave, his request that she return to work, and his refusal to acknowledge her medical documentation, Defendants do not deny such, but, instead, contend that they all relate to the true and legitimate reason for Plaintiff's termination. It is unnecessary to relate in this Decision and Entry the chronology of the County's communications with Plaintiff while she was away from work, and the explanations it provides for why it refused to accept the medical documentation she provided. It is enough to note that Defendants have adduced evidence, to which Plaintiff does not respond, that the actions taken by the County were reasonable, that they were

taken in good faith, that legal counsel for both the County and Plaintiff were involved, and that Plaintiff did not verify the necessity of her extended absence in accordance with the County's request. (*See* Trick Aff. and attachments thereto.) Having considered the Defendants' evidence, and there being no response from Plaintiff calling the sufficiency of that evidence into doubt, the Court does not find that the actions of Trick and the County were motivated by gender-based animus.

*Second,* Underberger's requests that Plaintiff clean a particular restroom in the Reibold building and clean up a used condom from an escalator appear harmless. Underberger was the custodial supervisor and Plaintiff was a custodian. Without elaboration, which Plaintiff does not offer, the Court cannot find that these acts constitute sexual harassment on their own or contribute to a hostile work environment. Plaintiff must do more than demonstrate that she was asked to do her job; she must at least show that she was asked to perform tasks that Underberger would not have asked her to perform had she been a man, or in a manner that he would not have requested of a man. *See Bowman,* 220 F.3d at 463; *Williams,* 187 F.3d at 565. *Third,* the allegation that Underberger phoned her at home for her shirt size is also of no consequence. Underberger stated in his affidavit that he was filling out order forms for new work uniforms for all employees under his supervision, and that he phoned Plaintiff at home because she was on an extended sick leave. (Underberger Aff. ¶ 10.) Plaintiff did not respond to this explanation, or further elaborate on the significance of her allegation. Because she has not adduced facts to support her allegation that this act was motivated by gender-based animus, no genuine issue of material fact exists with respect thereto.

*Fourth,* keeping in mind that the critical issue is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed, *see Oncale v. Sundowner Offshore Serv., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *Bowman,* 220 F.3d at 463, and that Title VII is not to be used as a "general civility code," *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275, the Court is equally reluctant to attribute any probative value to the allegations that the repair of vacuum cleaners and paper towel dispensers are generally the bailiwick of County maintenance staff. That Underberger wrongly instructed Plaintiff to perform tasks outside her typical job description does not give rise to a genuine issue of material fact absent an indication that he was motivated in issuing such instructions by the fact that she is a woman, and would not have done so but for that fact.

*Fifth,* the same fate must befall the allegations that Underberger yelled at Plaintiff or used vulgar language on three separate occasions. Plaintiff alleges that on February 3, 1999, Underberger yelled at her and berated her generally (Compl.¶ 20), that on April 9, 1999, he yelled, at Plaintiff and another female employee, "Ladies, this is not break time" (*id.* ¶ 21), and that on December 16, 1999, Underberger inquired of Plaintiff and the same other female employee, "What the hell are you looking at?" (*Id.* ¶ 30.) Although these actions may perhaps be uncivil in a work environment, without actual facts to support her allegation that they were the product of gender or sex-based animus, the Court cannot find a genuine issue of material fact on this point. *Sixth,* Underberger's alleged statement of April 12, 1999, that he would have Plaintiff written up for insubordination if she did not improve in her performance, and his issuing to Plaintiff a negative performance

memorandum on May 25, 1999, are also not probative evidence that Underberger's treatment of Plaintiff was motivated by gender bias.

*Seventh,* regarding the alleged events of December 16, 1999, assuming Underberger did indeed physically accost Plaintiff by threatening to hit her, that would no doubt give rise to a threatening and even humiliating encounter. On the other hand, for Title VII liability purposes, it suffers from the same defect discussed above, that being that although indicative of personal animus, it is not indicative of gender-based animus. There is no evidence that his attempt to hit her was motivated by the fact that she is a woman, or any evidence of a history of his being violent toward women, which might give rise to a genuine issue of material fact.[11]

In the end, the only two incidents which bear any signs of gender-based harassment are the two brushing incidents, of December, 1998, and January, 1999. Here, the Court returns to Defendants' statute of limitations argument. Because all of the other alleged acts of Defendants of which Plaintiff has complained in a timely fashion are not demonstrative of sexual harassment, the brushing incidents, which were not complained of in timely fashion, cannot be considered, as Plaintiff cannot show that they were part of a greater pattern of harassment. *See Morgan,* 122 S.Ct. at 2074. On this basis alone, Defendants' Motion for Summary Judgment would have to be sustained as to the First and Second Claims for Relief.

Even if the Court were to consider whether the brushing incidents, taken together, had an adverse effect on Plaintiff's employment, it would find that they did not. Keeping in mind that acts of harassment, unlike discrete acts of discrimination, are only actionable where they occur with such frequency and severity that they unreasonably interfere with an employee's work performance, *see id.,* the probative value of these two incidents is negligible. Without any further elaboration or clarification as to what the alleged "brushing" consisted of, the allegations that such occurred on two occasions are not sufficient to give rise to a genuine issue of material fact, and thus survive summary judgment. Of the utmost importance is the lack of evidence that these encounters, even if offensive, interfered in any way with Plaintiff's ability to perform her job, let alone in a manner so severe or pervasive that they altered the conditions of her employment and created an abusive working environment. *See Williams,* 187 F.3d at 560. On this point, perhaps most damaging to Plaintiff's claim is the fact that after June, 1999, Plaintiff no longer worked under Underberger's supervision. This is significant. There are no allegations of harassment *of any kind* for the time period between May 25, 1999, the date on which Underberger filed his negative performance memorandum, and December 16, the date of Plaintiff's alleged physical confrontation with Underberger. Moreover, when the Court removes these two allegations from the calculus on account of their not being probative of gender-based animus, it is evident that Plaintiff continued

---

**11.** Plaintiff alleges in her Verified Complaint that she has "information and belief" that another female employee, Vanessa Ward, was shoved against a wall by Underberger. (Compl.¶ 55.) The Court cannot give Plaintiff the benefit of the doubt on this issue because it is clear that she does not have independent knowledge of this incident, and she makes no attempt to corroborate it. Rule 56(e) of the Federal Rules of Civil Procedure requires a showing that the affiant is competent to testify to the matters stated in her affidavit. Thus, absent an affidavit from Ward or some other sworn witness, the Court must disregard this allegation.

to work for almost a full year, until she left work on the morning of December 16, 1999, without sexual harassment from Underberger. Although she was not entirely free of Underberger's presence during this time, the facts hardly demonstrate that in her day-to-day, or even month-to-month, duties, Plaintiff's environment was "permeated with discriminatory intimidation," such that she was inhibited from performing her tasks dutifully due to "severe or pervasive" hostility.

Upon a broad review of the cases, the Court is convinced that Plaintiff has failed to raise a genuine issue of material fact. With respect to her allegations, assuming their truth, a reasonable jury could not conclude that Underberger, and therefore the County, sexually harassed her and created a hostile work environment.[12] The following cases demonstrate that a much greater showing of harassment must be made before Title VII liability can attach on account of a hostile work environment: *Black v. Zaring Homes, Inc.*, 104 F.3d 822 (6th Cir.) (reversing judgment on a jury verdict and holding that derogatory comments about the female gender in general and the female plaintiff in particular, made on a regular basis in the plaintiff's workplace, though humiliating to the plaintiff, did not amount to actionable sexual harassment), *cert. denied*, 522 U.S. 865, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571 (11th Cir.2000) (reversing judgment on a jury verdict and holding that a male coworker's calls to the female plaintiff's home, frequent invitations to lunch, occasional staring, and several physical "touchings" of the plaintiff's ring, knee, and dress hem, did not amount to actionable

sexual harassment), *cert. denied*, 531 U.S. 1076, 121 S.Ct. 772, 148 L.Ed.2d 671 (2001); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir.1998) (holding that a male supervisor's remark that the female plaintiff had been voted the "sleakest ass" in the office and a single, deliberate touching of the plaintiff's breasts with papers he held in his hand did not amount to actionable sexual harassment); *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1260–63 (10th Cir.1998), *cert. denied*, 526 U.S. 1039, 119 S.Ct. 1334, 143 L.Ed.2d 498 (1999) (holding that evidence that a male coworker uninvitedly touched one of two female plaintiffs on four occasions, occasionally brushed both plaintiffs, took the plaintiffs to the restaurant Hooters (known for its scantily clad female wait staff), and made several comments containing sexual innuendo, though creating an "unpleasant" work environment, did not amount to actionable harassment); *Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 761–62 (8th Cir.1998) (holding that genuine issues as to whether a male manager "often" told the female plaintiff that she smelled good, patted her back, and brushed up against her, and "constantly" flirted with her, invited her to go swimming with him, and asked her if she had heard the rumors about a coworker's penis size, amounted to evidence on the "borderline" of actionable sexual harassment, but enough such that summary judgment for defendant was inappropriate); *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 838 & 840 (8th Cir.1998) (affirming judgment for female plaintiff on claim of sexual harassment where evidence at trial demonstrated that a male coworker "often" brushed up

---

**12.** It is noteworthy that Plaintiff has not made any allegations that Underberger ever used derogatory language or spoke sexual epithets. While it is possible that gender-based animus underlay all of Underberger's interactions with Plaintiff, such a fact cannot be reason-

ably inferred from the evidence she has adduced. *See, e.g., Bowman*, 220 F.3d at 464 (pointing out the difficulty of inferring gender-based discrimination from physical encounters in an office where not accompanied by any discriminatory comments).

against her, on at least one occasion brushed her buttocks, chronically made comments laden with sexual innuendo, and also acted inappropriately toward other female coworkers); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428 (7th Cir.1995) (holding that a male manager's frequent comments and glances laden with sexual innuendo did not amount to actionable sexual harassment); *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1041–43 (7th Cir.1994) (affirming judgment for female plaintiff on claim of sexual harassment where evidence at trial demonstrated, among other things, that the male president of the defendant company regularly quizzed female employees on the frequency of their sexual relations, frequently engaged in sexually explicit phone conversations which the overwhelmingly female staff could overhear through his open office door, publicly referred to one female employee as "Ms. Boobs," and frequently brushed up against the plaintiff and other female employees); *Campbell v. U.S. Postal Serv.*, 151 F.Supp.2d 1284 (D.Kan.2001); *Lucas v. South Nassau Communities Hosp.*, 54 F.Supp.2d 141, 147 (E.D.N.Y. 1998); *Beckwith v. Career Blazers Learning Ctr. of Washington, D.C.*, 946 F.Supp. 1035 (D.D.C.1996); *Smith v. American Int'l Group, Inc.*, 2002 WL 745603 (S.D.N.Y. April 26, 2002); *Ballance v. Energy Trans. Corp.*, 2001 WL 1246586 (S.D.N.Y. Oct. 18, 2001); *Salvatore v. KLM Royal Dutch Airlines*, 1999 WL 796172 (S.D.N.Y. Sept.30, 1999); *Wittenberg v. St. Charles Mercy Hosp.*, 1999 WL 728102 (N.D.Ohio Sept.14, 1999), *aff'd*, 229 F.3d 1155, 2000 WL 1175429 (6th Cir. 2000).

An unreported case out of the District of Kansas highlights perhaps the most precise distinction between actionable brushing and non-actionable brushing. In *Duvall v. Midwest Office Tech., Inc.*, 1999 WL 1423766 (D.Kan. Dec. 20, 1999), the plaintiff alleged that she was touched by the defendant in a sexually suggestive manner on at least four occasions, including three acts of his brushing past her in the hallway, and one act of his placing his hand on top of hers. To these allegations, the court remarked: "When taken individually and in isolation, these alleged instances of misconduct, even if offensive and inappropriate, would not be considered sufficiently severe or pervasive to rise to the level of sexual harassment within the meaning of Title VII." 1999 WL 1423766, at *5. Only when considered along with the allegations that the defendant made "frequent references to plaintiff's clothing and figure," and made vulgar comments about women in general, did the court find the evidence sufficient to survive summary judgment. *Id.* at *5–6.

The evidence in this case, even if not time-barred, does not create a genuine issue of material fact as to whether Plaintiff suffered "severe or pervasive" harassment in her place of employment. *First,* she has failed to adduce evidence that she suffered a discrete act of discrimination, which adversely affected her employment conditions. *Second,* the bulk of the alleged acts of harassment on which she bases her claims are not probative of sex or gender based discrimination. *Third,* to the extent her claims of harassment (hostile work environment) are based on the alleged brushing incidents, they are untimely. *Fourth,* even if her harassment claims were not untimely, the alleged brushing incidents are insufficient, as a matter of law, to support a finding of liability under Title VII. Accordingly, as to these claims (First and Second Claims for Relief), Defendants' Motion for Summary Judgment is SUSTAINED.

### C. *Retaliation*

██ Claims for retaliation must be analyzed pursuant to the same well-known *McDonnell Douglas* test which controls in

Title VII claims based on indirect discrimination. *See Virts v. Consolidated Freightways Corp. of Delaware,* 285 F.3d 508, 521 (6th Cir.2002). Thus, the Court must first determine whether Plaintiff has stated a prima facie claim. A prima facie claim of retaliation requires a showing that: 1) Plaintiff engaged in activity protected by Title VII; 2) her exercise of this right was known by the County; 3) that, thereafter, the County took an employment action adverse to the plaintiff; and 4) that there was a causal connection between the protected activity and the adverse employment action.[13] *See Williams,* 187 F.3d at 568.

That Plaintiff can satisfy the first three prongs is not in dispute. It is the causation factor on which Defendants focus. Plaintiff emphasizes in her Memorandum Contra that the sole act of retaliation of which she is complaining is the County's act of terminating her. (Doc. # 13 at 16; Compl. ¶ 75.) According to Plaintiff, she was terminated on June 28, 2000, because she had filed her first EEOC complaint on January 24, 2000. Defendants argue that the temporal lag of just over five months is too great to give rise to a genuine issue of fact as to causal connection, particularly in the absence of any other evidence suggesting that her termination was the product of retaliation. (Defendants also posit evidence that Plaintiff was terminated for legitimate, non-discriminatory reasons, but before it need consider those reasons, the Court must first be satisfied that Plaintiff has created a genuine issue of material fact as to each factor of the prima facie test.) Plaintiff responds merely by stating that she disagrees with Defendants' argument. Turning Defendants' argument around, she argues that based on the temporal proximity between the two events, a jury *could* infer that there was a causal connection between the filing of her EEOC complaint and her termination. (Doc. # 13 at 18.)

 The Court must agree with Defendants. Plaintiff's exact position has been rejected by the Sixth Circuit on multiple occasions. Where a plaintiff attempts to show that a causal connection exists between her engaging in the protected activity and her termination by relying exclusively on the temporal proximity of the two events, the argument must be rejected. *See Little v. BP Exploration & Oil Co.,* 265 F.3d 357, 363–64 (6th Cir.2001); *Nguyen v. City of Cleveland,* 229 F.3d 559, 566 (6th Cir.2000); *Cooper v. City of N. Olmsted,* 795 F.2d 1265, 1272 (6th Cir.1986); *Parnell v. West,* 114 F.3d 1188, 1997 WL 271751, at *2 (6th Cir.1997). Although longer periods between the doing of a protected activity and the suffering of an adverse employment action have contributed to the drawing of an inference of causation, the temporal aspect alone has never been dispositive. For example, in *Harrison v. Metropolitan Gov't of Nashville and Davidson County, Tenn.,* 80 F.3d 1107, 1118–19 (6th Cir.), *cert. denied,* 519 U.S. 863, 117 S.Ct. 169, 136 L.Ed.2d 111 (1996), where it was found that the plaintiff had been terminated approximately one year and three months after he had last filed an EEOC complaint, the Sixth Circuit rejected the argument that such a length of time defeated the inference that a causal connection existed. Although it did not accept the defendant's argument that an intervening period of fifteen months must defeat an inference of causation, neither did it hold that a period of fifteen months by itself is enough to create an inference.

---

13. At summary judgment, the more correct characterization of Plaintiff's burden is that she must create a genuine issue of material fact as to each element of her prima facie claim, such that a trier of fact, were the case to go to trial, could reasonably find that she had actually stated a prima facie claim.

Only in conjunction with other probative evidence adduced by the plaintiff, including evidence that his manager had stated that he would not hesitate to run employees out of his department, and evidence that three co-workers also feared retaliation for engaging in protected activities, did the court hold that the fifteen-month lapse contributed to an inference of causation. 80 F.3d at 1119.

Plaintiff does not, in the roughly two and a half pages of her Memorandum Contra devoted to her retaliation claim, point to any evidence suggesting a causal connection between the filing of her EEOC claim in January of 2000, and her termination in June. (*See* Doc. #13 at 15–18.) In her entire argument, she merely restates Defendants' argument, clarifies the raw basis for her claim, and recites black letter law relevant to the Court's Title VII analysis, all of which is to say, she fails to set forth sufficient, indeed any, evidence that the County's act of terminating her was in retaliation for her having filed an EEOC complaint.

Because she cannot raise a genuine issue of material fact as to the fourth element of a prima facie case of retaliation, the Court need not move to the second step of the *McDonnell Douglas* analysis, and consider the facially legitimate and non-discriminatory explanations for her termination, as set forth by Defendants. On this claim (Third Claim for Relief), Defendants' Motion is SUSTAINED.

### D. *Causes of Action Arising Under Ohio Law*

Plaintiff's Fourth Claim for Relief is an omnibus claim for negligent and/or reckless failure to train, negligent and/or reckless hiring, and negligent and/or reckless

failure to investigate her internal discrimination complaint. Her Fifth Claim for Relief is for Intentional Infliction of Emotional Distress. These claims were properly raised in this Court pursuant to the Court's supplemental jurisdiction over related state law claims. *See* 28 U.S.C. § 1367(a). Section 1367(c)(3) of that same statute grants this Court the discretion to refuse to exercise jurisdiction over supplemental claims arising under state law, where the federal claims, over which the Court had original jurisdiction, have been dismissed. Often times, this is the appropriate course to take. *See Brandenburg v. Housing Authority of Irvine*, 253 F.3d 891, 900 (6th Cir.2001) (stating that "the usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment") (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). Be that as it may, because the law is settled in Ohio as to these two causes of action, and because the parties have had full opportunity to brief the facts, the Court shall rule with respect to these claims.

Plaintiff's Fourth Claim for Relief is directed only at the County Board of Commissioners. With respect to this claim, in Ohio, in order to maintain a negligence action, a plaintiff must show the existence of a duty, a breach of that duty, and that the breach of that duty proximately caused the plaintiff's injury. *See City of Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St.3d 416, 768 N.E.2d 1136, 1144 (2002). The intermediate appellate courts of Ohio have carved out a particularized framework for analyzing claims of negligent hiring, retention, entrustment, and supervision and the like.[14] In such an

---

14. The Ohio Supreme Court case typically cited by lower courts as recognizing the tort is *Ruta v. Breckenridge–Remy Co.*, 69 Ohio St.2d 66, 430 N.E.2d 935 (1982). There the court stated, at 938:

action, it is typically stated that the plaintiff must prove "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining [or supervising, etc.] the employee as the proximate cause of plaintiff's injuries." *See Steppe v. Kmart Stores*, 136 Ohio App.3d 454, 737 N.E.2d 58, 66 (1999); *see also Harmon v. GZK, Inc.*, 2002 WL 191598, at \*16 (Ohio Ct.App. Feb. 8, 2002).

 Plaintiff herein does not so much as state in her Memorandum Contra what duty it is the Board owed her, or how it happened that the Board proximately caused her alleged injuries. She merely states that it would be possible for a reasonable juror to conclude that the Board was "negligent" in not preventing all of those acts of harassment which have already been discussed in this Decision and Entry. (Doc. # 13 at 19–20.) This argument is of little assistance to the Court. There has been no showing whatsoever that Underberger, Trick, and Walker were not qualified for hire into their respective positions, such that a jury could find that the Board was unreasonable in so hiring any of them. Moreover, there has been no showing that any of these Defendants was not properly trained. It may be true that they were not, but without offering evidence of how they acted out of conformity with what is generally expected of persons in their respective positions, or, more to the point, how the Board was negligent in either causing or failing to correct the nonconforming actions, neither the Court nor a jury is in a position to make that determination on the basis of the facts submitted by Plaintiff. On a related note, for the reasons stated above with respect to Plaintiff's harassment claims, without any evidence of how internal discrimination complaints are investigated generally, there is no reason to think that Walker's investigation of Plaintiff's complaint of June 21, 1999, was not undertaken in reasonable fashion, or that the Board had any duty beyond that to conduct a follow-up investigation of its own.

As to all of the alleged acts of harassment, Plaintiff has failed to demonstrate either that a proper investigation of such was not conducted, that the acts were even wrongful in nature, or, even if conceivably wrongful, that the Board itself knew or should have known about them.[15] Because she cannot show that the Board acted unreasonably in its hiring, training, or investigation into the actions of Underberger, Trick, and Walker, Plaintiff cannot show that the Board proximately caused her injury, and thus was negligent (or, of course, reckless). Accordingly, as she has not raised a genuine issue of material fact with respect to this claim (Fourth Claim

We are not called upon to decide whether the Court of Appeals correctly defined the essential components of the tort of negligence in hiring or retention, or even whether that tort is recognized in Ohio as the basis for a cause of action separate and distinct from other recognized theories of recovery, such as negligent entrustment and respondeat superior. What we are asked to decide is if the Court of Appeals required plaintiffs to introduce sufficient proof that Decker was dishonest to avoid a directed verdict, in addition to requiring proof of the other five elements, which the parties and the courts below assumed constituted a recognized tort.

**15.** For example, Plaintiff has not adduced any evidence that she ever communicated to the Board or any of her supervisors the fact that, as she now alleges, Underberger tried to hit her on December 16, 1999. Furthermore, because it is not apparent how most of the other allegations are even colorably wrongful, the Court cannot make a reasonable inference that any of the Defendants were negligently hired or trained.

for Relief), as to this count, Defendants' Motion is SUSTAINED.

 As to the Fifth Claim for Relief, a claim for intentional infliction of emotional distress will lie where "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 6 Ohio St.3d 369, 453 N.E.2d 666, 671 (1983)(citing Restatement (Second) of Torts § 46(1) (1965)). The Ohio Supreme Court has stated that "liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'," and "[t]here is no occasion for the law to intervene in every case where some one's [sic] feelings are hurt." *Id.*

 In this case, there is no evidentiary support for a finding of intentional infliction of emotional distress. On this claim, Plaintiff merely directs the Court's attention back to her argument under her Title VII claims, and states that a reasonable jury could find that the County's act of terminating her after she repeatedly requested leave, which itself was necessitated by Defendants' harassing conduct, "was unreasonable under the circumstances." (Doc. #13 at 19.) To begin with, "unreasonable under the circumstances" is not the proper standard. In

any event, for the reasons already stated, the Court is not persuaded that Defendants' actions were discriminatory, let alone "outrageous." Yet, even had Plaintiff demonstrated that Defendants could be found liable under Title VII, such a conclusion would not be enough, for it is well-established under Ohio law that discrimination, by itself, is insufficient to support an intentional infliction of emotional distress claim. *See Bryans v. English Nanny and Governess Sch., Inc.*, 117 Ohio App.3d 303, 690 N.E.2d 582, 592 (1996). As articulated by the Sixth Circuit:

> But an employee's termination, even if based upon discrimination, does not rise to the level of "extreme and outrageous conduct" without proof of something more. If such were not true, then every discrimination claim would simultaneously become a cause of action for the intentional infliction of emotional distress. *See Baab v. AMR Services Corp.*, 811 F.Supp. 1246, 1269 (N.D.Ohio 1993) ("To say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement."); *Bryans v. English Nanny and Governess Sch., Inc.*, 117 Ohio App.3d 303, 690 N.E.2d 582, 592 (1996) (holding that even if the plaintiff-student proved her claim of discrimination on the basis of disability, the school's conduct was "not so extreme or outrageous as to be intolerable in a civilized community").

*Godfredson v. Hess*, 173 F.3d 365, 373 (6th Cir.1999); *see also Black v. Columbus Public Schs.*, 124 F.Supp.2d 550, 588 (S.D.Ohio 2000); *Stoklosa v. Consolidated Rail Corp.*, 864 F.2d 425, 426 (6th Cir. 1988); *Francis v. Gaylord Container Corp.*, 837 F.Supp. 858, 864 (S.D.Ohio 1992).[16]

---

**16.** One Ohio court addressing a claim for intentional infliction of emotional distress stemming from the plaintiff's termination put it this way:

> Beyond the inherently unpleasant circumstances of any termination, the language and tone of [Defendant] was not offensive or abusive. Unfortunately, [Plaintiff's] termination, in whatever location it took place, was likely to be an upsetting episode. However, the facts do not indicate that the

Accordingly, as Plaintiff has raised no genuine issue of material fact as to her Fifth Claim for Relief, with respect thereto, Defendants' Motion for Summary Judgment is SUSTAINED.

## IV. *Conclusion*

For the reasons stated, as to Plaintiff's First, Second, and Third Claims for Relief, arising under Title VII and Ohio Rev.Code § 4112.01, *et seq.,* and as to Plaintiff's Fourth Claim for Relief, for various acts of negligence and/or recklessness, and as to her Fifth Claim for Relief, for intentional infliction of emotional distress, Defendants' Motion for Summary Judgment (Doc. # 12) is SUSTAINED.

Judgment is to be entered in favor of the Defendants and against the Plaintiff.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

actions of Bailey were extreme or outrageous.

*Morgan v. Taft Place Med. Ctr., Inc.,* 1998 WL 295560 (Ohio App. June 8, 1998).